AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Oregon

FILED02 MAY '19 11:32USDC-ORP

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. '19-MC-385 |
| The Cellular Telephone Assigned Call Number 442-270-9387 and IMEI: unknown | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A hereto,

located in the _____ District of _____ Oregon _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | Conspiracy to distribute a controlled substance (heroin and methamphetamine), distribution and possession with the intent to distribute a controlled substance, and use of a communication facility to commit the offenses. |

The application is based on these facts:

See affidavit of HSI Special Agent Clinton Lindsly, which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 12/31/2019 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Clinton Lindsly, Special Agent, HSI
*Printed name and title*

~~Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone at _____ a.m./p.m.~~   *(specify reliable electronic means)*

Date: May 2, 2019

_____
*Judge's signature*

City and state:  Portland, Oregon

Hon. John V. Acosta, United States Magistrate Judge
*Printed name and title*

DISTRICT OF OREGON, ss:          AFFIDAVIT OF CLINTON LINDSLY

## Affidavit in Support of an Application
## for a Search Warrant for Geolocation Data

I, Clinton Lindsly, being duly sworn, do hereby depose and state as follows:

## Introduction and Agent Background

1.      I am an investigator or law enforcement officer of the United States within the

meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to

make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      I have been employed as a Special Agent (SA) by Department of Homeland

Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security

Investigations (HSI), since August of 2010.   I am currently assigned to the ICE/HSI Office of

the Assistant Special Agent in Charge, in Portland, Oregon narcotics unit.   Previously, I was

assigned to the ICE/HSI Office in Los Angeles, California, where I worked for over six years in

a money laundering and narcotics group that specialized in undercover operations.   My formal

law enforcement training includes successfully completing the 23-week HSI basic training

course at the Federal Law Enforcement Training Center in Glynco, Georgia.   During the

training, I learned how controlled substances are manufactured, consumed, packaged, marketed,

and distributed.   Since then, I have participated in dozens of drug investigations which utilized

wiretaps, controlled purchase operations, physical surveillance, trash searches, electronic vehicle

tracking, pole cameras, cars with hidden compartments used to transport drugs, buy / walks, buy

/ busts, cell phone geo-location techniques, cell-site simulators, undercover operations including

narcotics and money laundering, informants, search warrants, interviews, arrests, and/or pen

register/trap and trace orders..   I have interviewed and managed informants in drug cases,

prepared and executed search warrants, arrested and interviewed suspects, conducted physical

surveillance, and operated/utilized electronic and video surveillance during my drug investigations.   I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug trafficking.   In 2011, I was cross-designated with United States Code Title 21 Authority by the U.S. Drug Enforcement Administration to investigate narcotics cases.   My most recent Title 21 authority update was on September 14, 2018.

3.    I have participated in many aspects of drug investigations.   I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering.   I am also familiar as to the manner in which narcotics traffickers transport and distribute narcotics in areas they control.   I am familiar with how drug traffickers utilize counter-surveillance techniques to avoid detection by law enforcement. Additionally, I have also been involved in investigations involving wiretaps as part of federal investigations into narcotics trafficking.

4.    I also know that drug traffickers often communicate with their drug-trafficking associates using cellular telephones.   I have become aware that more sophisticated drug trafficking networks, in addition to using oral communications over cellar telephones, now utilize electronic communications such as email, WhatsApp, Blackberry devices or other smart phone devices, Voice over Internet Protocol, video chat, internet messaging services, and social networking sites to communicate with one another such as Facebook, Twitter, and Instagram. During drug-related communications, traffickers often use coded or cryptic language to disguise the drug-related nature of their conversations.

5.    Based on my training and experience, I know that in many narcotic trafficking organizations, different factions of the organization are compartmentalized to protect the

**Page 2 – Affidavit of Clinton Lindsly**

organization as a whole.   I know that the organizations' recruiters, transporters, distributors,
customers, and money launderers often do not know each other.   Limiting the access and
knowledge of each participant serves to protect the organization if and when a participant is
identified by law enforcement.   I also know that narcotics distribution organizations
compartmentalize the information available to any one member of the organization so that even
if an arrested subject was fully forthcoming, interviews would only yield limited information as
to the interviewee's limited knowledge of the organization.

      6.      I submit this affidavit in support of an application for a search warrant under Rule
41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(c)(1)(A) for information
about the location of the cellular telephone assigned call number **442-270-9387**, with an
unknown International Mobile Equipment Identity ("IMEI") number (hereinafter "**Target Cell
Phone**"), whose wireless service provider is T-Mobile a company headquartered at 3625 132nd
Ave SE, Bellevue, Washington, as described in Attachment A hereto.   **Target Cell Phone** was
activated on an unknown date, with an unknown subscriber, and is currently being used by a
drug courier known as Felipe De Jesus SARCO Gomez.   As explained below, I believe there is
probable cause to obtain the location information as described in Attachment B hereto.

      7.      This affidavit is intended to show only that there is sufficient probable cause for
the requested warrant and does not set forth all of my knowledge about this matter.   The facts
set forth in this affidavit are based on my own personal knowledge, knowledge obtained from
other individuals during my participation in this investigation, including other law enforcement
officers, interviews of witnesses, a review of records related to this investigation,
communications with others who have knowledge of the events and circumstances described
herein, and information gained through my training and experience.

**Page 3 – Affidavit of Clinton Lindsly**

8.     Based on the facts set forth in this affidavit, there is probable cause to believe that

violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, have been

committed, are being committed, and will be committed by SARCO and other co-conspirators

both known and unknown who are yet to be identified, namely engagement in a conspiracy to

distribute and possess with the intent to distribute a controlled substance, the distribution and

possession with the intent to distribute a controlled substance, and the use of a communication

facility to facilitate these felony drug offenses.   There is also probable cause to believe that the

location information of **Target Cell Phone** described in Attachment B, will constitute evidence

of these criminal violations and will lead to the identification of other individuals who are

engaged in the commission of these offenses.

### Applicable Law

9.     Title 21 U.S.C. § 841(a)(1), provides that provides that it is a violation of federal

law to manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or

dispense a controlled substance, such as methamphetamine or heroin.

10.     Title 21 U.S.C. § 843(b), provides that it is a violation of federal law to

knowingly or intentionally use any communication facility in committing or in causing or

facilitating the commission of a felony drug offense in violation of 21 U.S.C. §§ 841(a)(1) and

846.

11.     Title 21 U.S.C. § 846, provides that any person who attempts or conspires to

commit any offense, such as those outlined in 21 U.S.C. § 841(a)(1), shall be subject to the same

penalties as those prescribed for the offense, the commission of which was the object of the

attempt or conspiracy.

**SUMMARY OF INVESTIGATION AND USE OF COURT AUTHORIZED WIRETAPS**

12.     Since December 2017, Investigators have been investigating a large-scale Drug

Trafficking Organization (DTO) responsible for distributing large amounts of controlled

substances including methamphetamine, heroin, and cocaine in the greater Portland, Oregon

metropolitan area.   This DTO is believed to be sourced from multiple kingpins in Mexico

including Cesar Bueno Martinez, who has been identified as a suspected replacement for Joaquín

Archivaldo Guzmán Loera, a.k.a. "Chapo," within the Sinaloa drug cartel.

13.     The investigation has revealed an individual known to us as Faustino MONROY

Diaz, who is the leader of the MONROY DTO, is responsible for distributing large quantities of

heroin, methamphetamine, and cocaine.   The Portland cell leader is Edgar Omar QUIROZ

Rodriguez, who controls drug couriers, such as an unidentified Hispanic male only known as

"SHAGGY," Lindsay Anne MARKS, Yunuhen SALAZAR Andrade, and others, within the

greater Portland, Oregon metropolitan area.   Customers call or text MONROY, who in turn

reaches out to QUIROZ.   QUIROZ then dispatches SHAGGY, MARKS, SALAZAR, and

others to retrieve the drugs from local stash houses (locations used to store and process drugs)

and then deliver the drugs to the customers.   Some of these drug customers are provided housing

and act as "sub distributors" for the MONROY DTO such as Michael ROHRSCHEIB, who is

now deceased with a suspected overdose on April 20, 2019, Rick DALHOVER, an unidentified

Hispanic male only known as "ROJO," and an unidentified Hispanic male only known as

"VERDE."   Once the drugs are sold, the same couriers then deliver the cash collected from the

sale of the drugs to Jesus GONZALEZ Vasquez at GONZALEZ BROS, a money remitter and

convenience store located at 12441 SE Powell Blvd, Portland, OR 97236.   Jesus GONZALEZ

then communicates with MONROY, QUIROZ, Unidentified Male 5190 (UM5190), Unidentified

**Page 5 – Affidavit of Clinton Lindsly**

Male 2657 (UM2657), or others to coordinate the wire transfer of the cash collected from the sale of drugs to Mexico and elsewhere.

14.     To avoid large losses of drugs if detected by law enforcement, the MONROY DTO has a multi-tier drug stash system whereas Eduardo MARTINEZ Perez, also known as "PULGA," maintains a larger stash house, which feeds the local stash houses controlled by the sub-distributors.   The MONROY DTO also routinely changes drug stash locations, rotates vehicles, rotates phones, and pays drug couriers to take time off if they are getting "hot," or detected by law enforcement.   Wiretaps have revealed that the MONROY DTO is provided drugs by three separate individuals associated with different DTOs, who we have identified as SARCO, who uses SARCO's Cell Phone and the **Target Cell Phone** and supplies heroin and methamphetamine to the MONROY DTO; an unidentified Hispanic male only known as "MICHOACANO," who supplies heroin and methamphetamine to the MONROY DTO; and, Javier Francisco SOTO Hernandez, who provides cocaine to the MONROY DTO.

15.     The MONROY DTO has a large customer base who are buying methamphetamine, heroin, and/or cocaine for purposes of further distribution.   Through the use of CIs, search warrants, surveillance, defendant interviews, trash pulls, recovered drug ledgers, wiretaps, and other investigative techniques, it is believed that this DTO is responsible for distributing, on a weekly basis, approximately 10 kilograms of heroin, 10 kilograms of methamphetamine, and one kilogram of cocaine, with gross sales of approximately $280,000 - $420,000, within the greater Portland, Oregon metropolitan area.   The DTO has a multi-tier organizational structure including the sources in Mexico, dispatchers in Mexico, organizers / stash house operations / distributors based in Portland, and drug customers.   It is believed that as

members of the DTO are arrested, they are replaced from the bottom up, such as a reliable drug customer becomes a sub distributor, which makes this DTO perpetual.

### Wiretaps Confirm SARCO Delivered Heroin Load to SALAZAR on April 2, 2019

16.     On March 20, 2019, Chief United States District Judge of Oregon, Honorable Michael W. Mosman, signed an order (19-MC-243) authorizing the lawful intercepts, including voice and electronic communications, of several phones used by members of the MONROY DTO in furtherance of their drug trafficking activities, including a phone used by MONROY, 971-288-3832 (TT1) and a phone used by QUIROZ, 971-291-8790 (TT2).

17.     On April 2, 2019, Investigators intercepted a series of calls on TT2, as used by QUIROZ, between MONROY, SARCO, SALAZAR.   The calls were conducted in the Spanish language and translated by monitors who are fluent in the Spanish language.   The calls were also in coded jargon.   Based on my training, experience, and knowledge of this investigation, I have become familiar with the code words used by QUIROZ and others to conduct their drug transactions.   During these coded intercepted calls, Investigators learned that SARCO was going to deliver approximately four pounds of heroin to SALAZAR and began to surveil SALAZAR. According to the wiretap calls, SARCO was to deliver "four" "morena."   I know that "morena" is a common code word for heroin.

18.     At approximately 8:00 p.m., Investigators followed SALAZAR, who was driving a black Ford Ranger, to Motel 6 located at 9225 SE Stark St, Portland, OR 97216.   This was the address which Investigators believe was relayed by SARCO to QUIROZ for the drug delivery over an intercepted call.   Specifically, prior to the meeting, SARCO told QUIROZ "Six at Stark and 205[th]" and the motel that Investigators followed SALAZAR to was located at Stark and the I-205 freeway.   SALAZAR then parked the Ranger underneath room number 234 or 235.

**Page 7 – Affidavit of Clinton Lindsly**

Investigators observed SALAZAR meet with a Hispanic male, later identified by an immigration

photograph as SARCO, outside of room 235, who then appeared to walk away from SALAZAR

with something in his hand.   Based off this observation and the wiretap calls, which indicated

that SALAZAR was going to give "20" to SARCO for the drugs, Investigators believe that

SALAZAR gave SARCO $20,000 to purchase four pounds of heroin ("morena").   Eventually,

SALAZAR went into room 235 with SARCO.

19.     At approximately 8:40 p.m., SALAZAR and SARCO exited the hotel room and

walked to the Ranger.   SALAZAR got into the Ranger and appeared to engage in conversation

with SARCO.

20.     At approximately 8:45 p.m., SALAZAR drove away in the Ranger.   Investigators

believe that SALAZAR purchased four pounds of heroin from SARCO for $20,000.   I also

know that, in the greater Portland, Oregon area, four pounds of heroin is a large amount and that

an individual selling four pounds of heroin does not do it as a one-time event, but rather this is

indicative of someone who is engaged in an ongoing commercial drug trafficking enterprise.

21.     After selling the drugs to SALAZAR, SARCO eventually returned to Mexico.

22.     April 3, 2019, Investigators sought and obtained Court authorization to geolocate

SARCO's Phone pursuant to search warrant signed by the Honorable Stacie F. Beckerman.

23.     Since then, SARCO has entered the United States several times and on at least

one occasion, that being April 21-22, 2019, traveled from the Mexican border back to the District

of Oregon.   Using Court Authorized GPS location from SARCO's Phone, I located the vehicle

being driven by SARCO when he entered the United States from Mexico several days prior, that

being a brown Volkswagen Jetta bearing Baja California, Mexico license plate #A16NTX4,

parked at Motel 6 located at 9225 SE Stark St, Portland, OR 97216.   This was the same hotel

**Page 8 – Affidavit of Clinton Lindsly**

that Investigators observed SARCO at when he delivered drugs to SALAZAR on April 2, 2019.

Before Investigators were able to install a Court authorized tracking device on the Jetta, it left the

District of Oregon and eventually went back to Mexico.

**Investigators Intercept SARCO Using Target Cell Phone to Discuss Drug Smuggling**

24.     On April 22, 2019, Chief United States District Judge of Oregon, Honorable

Michael W. Mosman, signed an order (19-MC-243B) authorizing the lawful intercepts, including

voice and electronic communications, of several phones used by members of the MONROY

DTO in furtherance of their drug trafficking activities, including a phone used by MARTINEZ,

that being phone number 352-459-9507 (TT10).

25.     During these lawful intercepts of MARTINEZ, SARCO has been intercepted

communicating with MARTINEZ about drug deliveries using SARCO's Phone and the **Target**

**Cell Phone**.   For example:

26.     On May 1, 2019, at approximately 4:16 p.m., MARTINEZ, using TT10, called

SARCO, using the **Target Cell Phone**.   The call was conducted in the Spanish language and

translated by monitors who are fluent in the Spanish language.   The monitors recognized the

user of the **Target Cell Phone** as SARCO, as they are familiar with the sound of his voice from

listening to other intercepted calls involving SARCO using SARCO's Phone.   During the

intercepted call and among other things, MARTINEZ told SARCO to "restart the phone and then

it would be done."   SARCO told MARTINEZ that he would "let the boss know since they were

coming down from the mountain," to which MARTINEZ acknowledged.   SARCO told

MARTINEZ that he would "let the boss know."   MARTINEZ asked SARCO to let "him know

about the other trip."   SARCO told MARTINEZ that he "was doing that but had a problem."

SARCO told MARTINEZ that the "boss wanted to send aqua and azucar morena to his

**Page 9 – Affidavit of Clinton Lindsly**

(MARTINEZ's) paleteria but he (SARCO) needed to receive all that tomorrow."   SARCO told MARTINEZ that "the guys had not confirmed with him (SARCO) if the chocolate was ready by tomorrow in order to deliver to the ninas," to which MARTINEZ acknowledged.   (Session #TT10-496)

27.    Based off this call, I believe that MARTINEZ and SARCO discussed the smuggling of methamphetamine and heroin from Mexico into the United States.   Specifically, MARTINEZ told SARCO to "restart the phone and it would be done," or that MARTINEZ paid to load minutes on to the **Target Cell Phone** per a previous intercepted call.   SARCO told MARTINEZ that he would let the "boss," or MONROY, know.   MARTINEZ asked SARCO to let "him," or MONROY, know about the other "trip," or drug smuggling from Mexico into the United States.   SARCO told MARTINEZ that he had told MONROY about the other drug trip but had a delay.   SARCO told MARTINEZ that MONROY wanted to send "aqua," or crystal methamphetamine, and "azucar morena," or heroin, to his (MARTINEZ's) "paleteria," or Portland, OR, but he (SARCO) needed to receive all the drugs tomorrow.   SARCO told MARTINEZ that the "guys," or unidentified drug sources in Mexico, had not confirmed with him (SARCO) if the "chocolate," or heroin, would be ready by tomorrow in order to deliver to the "ninas," or drug customers.

28.    Based off the fact that intercepted calls and surveillance confirmed that SARCO delivered a heroin load to SALAZAR on April 2, 2019, that SARCO again was in the District of Oregon on April 21-22, 2019, that SARCO, using the **Target Cell Phone**, was intercepted communicating with MARTINEZ about smuggling methamphetamine and heroin into the United States, and my knowledge of this investigation, I believe that there is probable cause to believe that the **Target Cell Phone** is being used to coordinate the delivery of large quantities of drugs

**Page 10 – Affidavit of Clinton Lindsly**

in violation of Title 21, United States Code Sections 841(a)(1), 843(b), and 846.   I also have probable cause to believe that the location information of **Target Cell Phone** described in Attachment B, will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

29.   In my training and experience, I have learned that Provider is a company that provides cellular telephone access to the general public.   I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.   E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.   Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.   These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.   Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.   Accordingly, cell-site data is typically less precise that E-911 Phase II data.

30.   Based on my training and experience, I know that Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Provider's network or with such other reference points as may be reasonably available.

**Page 11 – Affidavit of Clinton Lindsly**

31.     Based on my training and experience, I know that Provider can collect cell-site data about **Target Cell Phone**.

**Conclusion**

32.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).   I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Target Cell Phone** outside of daytime hours.

33.     I further request that the Court direct Provider to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Provider.   I also request that the Court direct Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of **Target Cell Phone** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

34.     Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States Attorney Scott Kerin.   I was informed that it is AUSA Kerin's opinion that the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

**Page 12 – Affidavit of Clinton Lindsly**

**Request for Delaying Notice**

35.      I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

30 days after the collection authorized by the warrant has been completed.   This delay is

justified because there is reasonable cause to believe that providing immediate notification of the

warrant may have an adverse result, as defined in 18 U.S.C. § 2705.   Based upon my

knowledge, training, and experience, it is my belief that providing immediate notice to subscriber

or user of the Target Cell Phone may result in the endangerment of the life or physical safety of

an individual, flight from prosecution, the destruction of or tampering with evidence,

intimidation of potential witnesses, and/or otherwise seriously jeopardize an investigation.   *See*

18 U.S.C. § 3103a(b)(1).   As further specified in Attachment B, which is incorporated into the

warrant, the proposed search warrant does not authorize the seizure of any tangible property.

*See* 18 U.S.C. § 3103a(b)(2).   Moreover, to the extent that the warrant authorizes the seizure of

any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or

electronic information, there is reasonable necessity for the seizure for the reasons set forth

above.   *See* 18 U.S.C. § 3103a(b)(2).

**Request for Sealing**

36.      I further request that this Court issue an order sealing, until further order of the

Court, all papers submitted in support of the requested search warrant, including the application,

this affidavit, the attachments, and the requested search warrant.   I believe that sealing these

documents is necessary because the information to be seized is relevant to an ongoing

investigation, and any disclosure of the information at this time may endanger the life or physical

**Page 13 – Affidavit of Clinton Lindsly**

safety of an individual, cause flight from prosecution, cause destruction of or tampering with evidence, cause intimidation of potential witnesses, or otherwise seriously jeopardize an investigation.   Premature disclosure of the contents of the application, this affidavit, the attachments, and the requested search warrant may adversely affect the integrity of the investigation.

Clinton Lindsly
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this _____ day of May 2019.

Honorable John V. Acosta
United States Magistrate Judge

**Page 14 – Affidavit of Clinton Lindsly**

## ATTACHMENT A

### Property to Be Searched

1.      The cellular telephone assigned call number 442-270-9387, with an unknown International Mobile Equipment Identity ("IMEI") number (hereinafter **"Target Cell Phone"**), whose wireless service provider is T-Mobile a company headquartered at 3625 132nd Ave SE, Bellevue, WA 98006.

2.      Information about the location of the **Target Cell Phone** that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to Be Seized

All information about the location of the **Target Cell Phone** described in Attachment A for a period of thirty days, during all times of day and night, and the status of the device and the account associated with the device (i.e., whether the device is active or operational and whether the account is in good standing, canceled, suspended, etc.). "Information about the location of the **Target Cell Phone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile (referred to hereinafter as "Provider"), Provider is required to disclose the Location Information to the government. In addition, Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Provider for reasonable expenses incurred in furnishing such facilities or assistance.

/ / /

/ / /

**Attachment B**

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

**Attachment B**